May it please the Court, my name is Rachel Fazio, and I represent the plaintiffs in this case. And this is a case brought from a district court's denial of plaintiff's request for preliminary injunctive relief. And in the process of denying this request, the district court abused its discretion on pretty much every issue. First of all, he applied an erroneously heightened standard for the showing of irreparable harm. As we know, after the Winter decision, plaintiffs are required to show a likelihood of irreparable harm, and plaintiffs did so in this case. The district court judge during the hearing consistently told plaintiffs that they would need to show 100 percent certainty of harm. But he corrected that in his ruling, did he not? He got the right standard, Judge Englund got the right standard by saying that likely success, not certainty, was the standard. Did he correctly state the standard in his written opinion? Yes. Did he apply that standard to the facts of this case? No. And he's the one who's going to be the judge. Scalia, why do you think that he didn't apply the correct standard? Well, for several reasons. First off, he actually denied plaintiff's motion from the bench, and he denied it based on his finding that we did not meet irreparable harm, prong of the preliminary injunction test. And he said because we had showed that it was probable that our harm would occur, but hadn't shown an absolute certainty. In addition, the certainty that the harm would occur, the likelihood that it would occur, was basically 80 percent chance. Eighty percent chance that the horses that these plaintiffs enjoy and observe and have created relationships with on this range for over decades would be removed. The BLM planned to remove 80 percent of the horses from the range. They would be gone forever, to short-term holding, then to adoption, or to long-term holding. The plaintiffs would never again be able to experience these horses wild and free-roaming on the range. And in stating that an 80 percent chance of that happening was not likely harm, that is legal error. In addition, his ---- Why is it legal error? I mean, do you think that ---- Because of the death ---- Is it your point that the plaintiffs have a right to see as many horses as they want to see? That's ---- that actually brings me to my second point about the error. Because you don't answer that question. The plaintiffs are injured irreparably by the removal of horses that they have come to observe and know. So they can't ---- so the horses that they see and the progeny of the horses that they see can never in any way be limited by the Bureau of Land Management. Once one of your plaintiffs enjoys seeing a horse, that horse and all descendants of that horse have a vested right to be on the range and not to be removed at all under any circumstances. I'm ---- Yes or no? I plaintiffs say yes. I don't ---- I don't ---- Here's the problem that I'm having. I suggest that you go to Congress and have them say yes, because that doesn't seem to be what Congress has said. Here's the problem that I'm having, is that is a different question when that whether or not the horses, the removal of the horses from the range will have an irreparable harming effect on my plaintiffs. So I see the question that you're asking me as one of legal authority. Can they remove the horses or can't they? And yes, under the statute, under certain circumstances, if they make a finding of excess and the horses are necessary to remove, they can be removed from the range under the statute. But that is not determinative of whether or not that removal will have likely irreparable harm on our plaintiffs. Well, it might have irreparable harm on your plaintiffs in a subjective way, but not in a legally compensable way. Well, I would disagree with that, because just like this Court recently decided in an alliance for the Wild Rockies v. Contrell, it is the forest that is being removed is the harm that the plaintiffs are suffering. Even though there's forest, maybe just like it, right next door to the thousands of acres they're removing. Your position is that it's irreparable harm when any horse is removed, even if it's removed pursuant to law. No. My position is that it is irreparable harm to these plaintiffs to have 80 percent of the horses removed from this HMA. That is this case. I don't think I can agree with that. Even if the 80 percent is in accordance with law? Well, the 80 percent is not in accordance with law. Well, then talk to us why that is so. Okay. Well, do we want to start with procedural violations of NEPA and the errors of law that the judge made in that regard, or do we want to go straight into the Wild Horse and Burrow Act? You're running your own argument. Okay. Well, I think I can dispense with the NEPA ones rather quickly. Our claims were that they were required to do an environmental impact statement, not just an EA, because this roundup was very different from all the past roundups. Specifically, in the past, they'd only removed 20 to 50 percent of the horses on the range, leaving the rest of the horses uncaptured, unharassed, not injected with PZP, immunocontraceptives. And in this case, they were intending to round up 100 percent of the horses, removing 80 percent from the range. The proper analysis associated with reviewing whether an EIS is mandated is directed by the case law of the circuit, and plaintiffs raised intensity factors. I want to make sure I understand your point here. Okay. What makes this major Federal action under NEPA and differentiates it from the prior actions is exactly what? There's actually four things. One, that this is a divergence from anything they've ever done in the Twin Peaks HMA. Okay. That's number one. But it's a much more It's different. It's different. It's much more intensive management, and it doesn't leave a certain segment of the population unmolested by the BLM. In the past, they only herded up and captured and removed the horses that were excess. In this case, they were rounding up every horse and then doing certain things to ones and returning them to the range. That is very different than anything that's happened on Twin Peaks HMA. How did you How could How can you determine what is an excess amount of horses and only round up those excess, rather than round them all up, see which ones have to be euthanized, which ones have to be transported, which ones have to be sent back in the field? That's a very good question. Actually, the determination of what number of horses can be on the range is something that needs to be done prior to the roundup, and it's something that was not actually done in this case. The statute uses the term excess animals, which is defined as those animals that must be removed from the range to maintain a thriving natural ecological balance. That phrasing, excess animals or thriving natural ecological balance, occurs 20 times in the statute. It is the benchmark, the trigger, the only thing that allows them to do a roundup. In this case, they didn't actually make a finding that any of the horses out there were excess. Sotomayor, can I bring you back for a moment to the NEPA? Sure. In addition to rounding up all of the horses before they make the selection, what else makes this a major Federal action? Well, there are intensity factors that we brought to the attention of the district court, and there are four of them. And the first one is that it's an unprecedented action for this HMA. The second one was that this roundup represents a decision in principle, because the Interior Secretary Salazar is currently circulating a new plan for managing wild horses for comment, not through the NEPA process, but just informal comment that he then, I don't know what, plans to present to Congress. But which basically has intensive roundups, rounding up all horses, aggressively using immunocontraceptives, and shipping off horses to long-term holding. So this activity that's happening here on this range has never been analyzed in environmental impact statements. The other intensity factors that relate to why an EIS was required in this case are that there is controversy, scientific controversy over the use of immunocontraceptives that the defendants just completely ignored. How does that relate? I'm having a little trouble seeing how that relates to the environment. What is the – the environmental issues don't go to the effect of the horses. They go to the effect of the environment. The horses are an integral part of the environment. Yes, they are. As much as the BLM would like to see them as not, they're actually a native species, and they are tied to this land pursuant to the act of Congress. Just like polar bears or something? Yeah. I mean, they belong there. There would not be a horse but for North America. Every single evolutionary iteration of the horse is found here and only here. And the best that we know at this point is they may have gone extinct 7,000 years ago, but that number keeps changing because they keep finding newer fossilized records. The horses that are out there on the HMA are genetically identical to the horses from the past. These are a native species. And so utilizing PZP on them alters their natural behaviors. It messes up their social bonds and creates havoc in their behavioral ecology. So it is a harm to the environment, and it is controversial in the scientific community. So you're kind of equating this to, like, fishing with nets and how the dolphins are harmed when their environment is disturbed by fishing. Yeah. I mean, in a way, it's a harvesting activity. Yes. What was wrong about the BLM's, the Bureau of Land Management's, 156-page environmental assessment with respect to this roundup? Because all they have to do, as far as we're concerned, is to take a hard look at the circumstances and then determine that there will not be a need for an EIS. Yeah. What specifically did the BLM not do or do wrongly that would require us, as a matter of law, to say that the BLM did not take a hard look at the circumstances? Well, first of all, they failed to provide the hard data upon which their conclusions were based. You mean their ALMs? No. That's a different issue. No. Their hard data with regard—their whole assertion is that there's harm on this range, we have to remove the horses immediately, and they relied on riparian functional assessments that they incorporated by reference into their EA. They did not provide the actual riparian functional assessments to the public. They did not provide the data upon which their expert opinions were based, which makes their expert opinions unreasonable. This circuit has been very clear that while you can incorporate by reference, you have to make the documents available so the plaintiffs and the court can know whether or not your conclusions are actually based on the hard data. Didn't the report, didn't the environmental assessment report provide instances of grass that had been damaged, feeding spots which had been damaged, and also some Indian relics which had been trampled by the horses? Isn't that the basis upon which they said there were too many horses out there? That is the summary of the so-called evidence which they refused to provide. That does not pass muster with NISA. They refused to provide the summary? No. They refused to provide the actual documents, so we couldn't – you can't actually serve them. You requested them? Oh, yes, we did. And they would not provide them. We finally actually received them, unfortunately, after all our briefing was due, after threatening to sue them under a FOIA claim. But getting back to this one point, and I know I only have four minutes left and so much more to say, with regard to the harm that the defendant's claim exists on this range, they are actually held to a standard of establishing that the thriving natural ecological balance is being threatened. As I said 20 times in the statute, we hear about excess animals, thriving natural ecological balance, which we shorthand T-N-E-B, and basically what the defendant said is, well, we have this AML, this appropriate management level, that's being exceeded, too many horses, got to get them off the range. The problem with that is, is that there's no actual connection between the AML and thriving natural ecological balance, even though defendants claim there is. In reality, there is not. And a review of the documents that are available here show that pursuant to the BLM's own definition of thriving natural ecological balance, the Twin Peaks HMA is currently being maintained in a thriving natural ecological balance. And so whether or not there are more horses than the AML is irrelevant, because the AML is not based on reality. There's a disconnect there. There's no rational basis, and it violates the Act fundamentally. What is, in your view, what is the AML based on? In my view, the AML is based on some administrative, I don't know what, from 1988. This AML was established over 20 years ago. It was brought forward twice without actual analysis. And the documents in the record, specifically the land health evaluation that was prepared in July of 2009 for the observation allotment, which is one area of the Twin Peaks HMA that covers two of the wild horse mustang ranges, but it's actually a grazing allotment as well. That document, which was based on these mysterious riparian functional assessments from 2009, indicates that for the five standards for public land health, all of them are being met. So there is no threat to T&EB. And for the riparian wetland sites, it is making progress toward meeting the standard. And that is their definition of thriving natural ecological balance. The whole purpose of this Act is to protect the wild horses from capture, harassment, branding, and death. And the only time the BLM gets to step outside of those prohibitions is if there is an excess of animals. And then, and only then, are they allowed to deal with the excess, and only the excess. The other areas in the Twin Peaks HMA are also meeting all the standards for land health evaluations. And the Twin Peaks HMA, where there's some evidence of impacts to some minor wetland sites, 15% of the wetland sites in Twin Peaks are functioning at risk with a downward trend. 2% of riparian sites are functioning at risk with a downward trend. This Twin Peaks is doing better than observation. And observation, they say, is T&EB, thriving natural ecological balance. OK, you have about a minute left, if you will. OK, I guess I'll reserve that. Thank you. May it please the Court. I am David Shilton, appearing on behalf of the Bureau of Land Management. With me at council table is Mr. Burden, who represents amicus, but he will not be presenting arguments, but can answer questions if there are any for him. I want to focus on the three issues that have been raised here today, which are the injunction standard that was applied by the district court, the NEPA question, whether the environmental assessment was adequate, and also the relationship between appropriate management levels and a thriving natural balance on the range. I think that plaintiffs have taken out of context a remark that the district court made at the preliminary injunction hearing, that the plaintiffs could not show with absolute certainty that their relationship with particular horses would be disrupted if there was a gather. The district court was not saying that he was applying an absolute certainty standard to the likelihood of harm. He was simply making a factual observation, testing counsel's position. And I just don't think you can take that. But why would he say you can't show it to an absolute certainty if that was not the standard he was applying? Why wouldn't he say you haven't been shown by a reasonable likelihood or a reasonable probability, or why would he make that statement if that weren't the standard he was applying? Well, I think in a colloquy with counsel, sometimes, you know, judges will test what you're saying by saying, you know, can you be absolutely certain of that? And I don't think it represents that the judge is necessarily going to apply that standard overall to the question of irreparable harm. Well, during the hearing, is there anywhere in the record where the appropriate standard was articulated by the judge? I can't recall now during the hearing if he set out the standard, but certainly in his opinion, which came out a few days later, he set out the standard as they have to show a likelihood of a threat of harm. And that's the proper standard, as everyone here agrees. And the district court's denial of the preliminary injunction was based on a balancing of the harms. The district court recognized that these plaintiffs enjoy visiting the horses out on this area. They have a connection to the area. But he pointed out that the excess of horses here is leading to degradation of the range, and that this is an environmental harm that has to be put into the balance, and that unless the gather took place, that the population of the wild the herd doubles in four years, and that this means further harm. And that that's the sort of harm that Congress was concerned about when it amended the Act in 1978 to require that BLM remove excess animals from the range. Would you agree that if the BLM did not properly follow the Act, that would be a basis for an injunction? If there were a violation of the Act, I think the district court would still have to weigh the equities. The Supreme Court has instructed that injunctions always require that. But there simply was no violation of the Act here. The district court Let me just ask you about the Act. I'm looking at Section 1333.2, where it talks about if the secretary determines that there is an overpopulation, he shall immediately remove excess animals from the range, so as to achieve appropriate management levels. Such action shall be taken in the following order and priority. So Congress has mandated that there is a particular order that removal must follow. A, the secretary shall order all sick or lame animals to be destroyed in the most humane manner possible. Nothing about removal there. So is it your position that the BLM followed this order and priority that's listed here in the statute when the first action to be taken is ordering all sick or lame animals to be destroyed? It did follow the priorities. The number one priority is to humane destruction of all lame or sick animals. And that's the first thing it does. It examines the animals and Rounded all of the animals up first. A doesn't talk about rounding up any animals. It talks about first ordering those to be destroyed and then B, such number of additional excess to be humanely captured and removed. So Congress explicitly set out an order and priority in which these actions must be taken. And that was not done in this case because A was not done before. The priority is for removal of animals. And that is referenced in the statute to mean the ultimate disposition of the animals. That's in the following order and priority. So the first priority is to order the animals to be destroyed. The second priority is if after you've done that there are excess animals, then you can remove them for private care and maintenance. Sotomayor, let me admonish the visitors in the courtroom that we do not permit demonstrations. We'll have to clear the courtroom if there are further demonstrations. Thank you. You may proceed. The first priority, the Secretary shall order old, sick or lame animals to be destroyed in the most humane manner possible. It does not say anything. It's silent on the question except to say most humane manner possible. So that is the standard. And the BLM has found that the most humane way to determine whether animals are too sick or old to withstand further, you know, adoption or whatever is to examine them closely with the, where if you do it on the range, you can't get the same kind of good identification. You can't examine their mouth to see if their teeth are all there. You can't see woods. Where is then the best explanation of all of this justification? The, well, the record of decision and I think the environmental assessment talk about the fact that this is humane, the way the BLM does its gathers and. For conclusions, but I don't, I don't quite see where all those conclusions flow from necessarily in terms of scientific data. Well, the. This has not happened before. Well, this actually has happened quite a bit. There's quite a record that the BLM has of prior gathers. And this is the normal priority as follows. It has found that. Can you point us to the record, please, where you have the history of the BLM having used this procedure before? Where is that in the record? The environmental assessment talks about prior gathers in this area. I don't. It's a long environmental assessment and I don't. Towards the beginning, it talks about prior gathers that have occurred in Twin Peaks, Twin Peaks area. Right. But you told us specifically that the methodology that's used this time has been used previously and the BLM has determined that this is the best method. So where is that in the environmental assessment backed up by scientific data? Well, it's in several different places because it's done by subject matter. For instance, the talking about the use of the immunocontraceptive is. I'm talking about the priority. We were talking about you're first supposed to examine the old and sick and lame. And you said that this methodology has been proven to be the best by the BLM. And so we were asking you where is the scientific data that supports the conclusion that this is the optimal method to follow the statute? That particular question, I'm sorry, I misunderstood. That question is not dealt with directly in the environmental assessment. The environmental assessment was focusing on whether there's a significant impact to the environment. The problem is you have to follow the statute, though. Right. And to me, in the environmental assessment, that's, I mean, that part of it is missing. The priority that's been ordered by Congress and why there's a deviation from that is missing. I tell you, BLM is relying on its legal interpretation, which is that the priorities apply to the ultimate removal and that that doesn't bar it from doing a preliminary gather in order to effectively. If we disagree with that interpretation, then that means you violated the Act, which would be a basis for an injunction. Right? It could be. But that would depend on there being, for one thing, a live controversy. And, you know, since the gather has already occurred and approximately seven horses were humanely destroyed because of preexisting conditions, I don't know that there's effective relief. The remainder of the horses could be returned, though, right? Well, the remainder of the horses, I don't think that the claim about the most humane way to euthanize old or sick really relates to the great majority of horses here who are, you know, very, very healthy and have been gathered and are being put up for adoption. But their overall claim for relief was that these horses were being taken away from their native habitat. So if the horses are being housed at long-term or short-term facilities, they could be reinstated into their native habitat, and that's a remedy that's available. Correct? Conceivably, the Court could order return of the horses, but I do think that would be contrary to the congressional directive that when BLM has determined there was an excess of horses, it needs to remove them from the range. And it has made a determination that 1,855 horses were excess. But if it didn't do it in accordance with the law, then it acted outside its authority. Well, I think we need to pinpoint what that legal problem was. I mean, we certainly disagree that there was a legal problem with regard to the euthanasia of old and lame and sick, but if that was a problem, it would only, I think, relate to the old and lame and sick. Again, we can't do that. My conceptual problem is the statute wasn't followed in terms of the priority and order. The difficulty I have is that conceptually, if you first address the old, the lame and the sick, there may not be an excess, and so the remaining horses may be undisturbed. But if you gather them all before you make that determination, then under the statute you violated the priority and you gathered horses that Congress did not contemplate being gathered under the statute. That's the conceptual problem I have with the approach that the BLM takes. I understand. The one problem with that is that the old and lame and sick make up a very small proportion of the population. If BLM has determined that there are 1,855 excess animals here, typically the number, you know, that need euthanization is very small. And here it was less than 10. And so that doesn't address the excess problem. And I think what Congress wanted here to do. And so while in this case there were a large number of excess horses, if we decide that the BLM can just round up all the horses every time and then make the decision, it may make a difference in a different case where the number of excess horses is smaller. Conceivably. But I think that we don't. Sotomayor. Can I just ask you? I'm sorry. I didn't mean to interrupt you. No, no. Go ahead, please. I just wanted to ask you what the relationship, since you touched on mootness, I wondered what the relationship was of this case to the D.C. Circuit decision, the opinion of Judge Friedman in the D.C. Circuit in defense of animals v. Salazar. Is that a different year or what is that? Yeah, it was a different gather. There are, you know, scores of these gathers happen every year. That was another in, I believe, in Nevada. But, yeah, there was a schedule. That case wasn't appealed? I don't believe it was, no. So it's a district court opinion we think correctly decided. Let me just ask you one more question. Do you disagree with the plaintiffs that these horses are a part of the environment? No, I don't disagree with that. Congress has determined they should be treated as part of the natural environment. They are not an endangered species, but they are. No, but they are part of the environment. So the effect on the horses would be, themselves, would be a part of any environmental study and assessment, I take it. That's correct. And this environmental assessment considers that, considers the effect of any immunocompromised deceptives and finds that that's safe. But the ultimate question, of course, is does this proposal bring about a significant environmental impact? And I think what this proposal was aimed at was bringing back an equilibrium. As with other animal populations, you sometimes get an overpopulation, and bringing them back to an equilibrium, where they're in balance with the resource, is not a significant environmental impact. BLM reasonably found that the primary effects of this gather would be to improve the vegetation, improve riparian areas that were being damaged. Along that line, do you take issue with the opposing counsel's representation that the BLM failed to make the underlying data available regarding the wetlands determination? The environmental assessment has sufficient data analysis to withstand analysis. Now, of course, the underlying question was, do you take issue with opposing counsel's representation that the BLM refused to make the underlying data, upon which the summary was based, available to the public? They did request the data. And she's correct that they did not get it until after the preliminary injunction occurred. The case, though, is still ongoing in the district court. That data still can be used in the district court. But what would be the basis for refusing to turn over the data, underlying data, to the public? Well, certain procedures need to be followed. You need to file a Freedom of Information request to get certain kinds of underlying data. If it's part of the environmental assessment? Well, the environmental assessment itself has a great deal of information, and certainly enough for the public to comment on it, and the public did comment on this. The environmental assessment includes photographs of, you know, areas where there has been damage. It includes data that has been gathered by its range specialists who have been able to determine that damage to riparian areas is occurring. And it's not just the current damage, but the concern that if you don't undertake a gather, the horse population will continue to grow and the damage will only get worse. So BLM is authorized to act proactively in this situation to prevent that further damage. Did your position as the position of the BLM that regardless of the rules of discovery in a civil lawsuit in Federal court, the documents which underlay the AML determination must be sought under FOIA, even though they're asked for by a litigant under Rule 34? Well, if there's a proper discovery request, I don't believe there was a discovery that was conducted in this case. I see. So there's two ways to get it, discovery or FOIA. Right. And nothing in between. Well. As far as you know. Plaintiffs can ask, and they've gotten, you know, other sorts of information, but the data sheets are something that, you know, may not, may be difficult to interpret correctly. There are a variety of reasons why BLM needs to follow its own procedures for releasing these. But again, I think the. The procedures of BLM are that unless an FOIA, Freedom of Information Act, request is made, or a request pending civil litigation in Federal court under Rule 34, they don't have to produce any underlying documents. Well, they can voluntarily produce. They often do. I think it's very much a case-by-case situation. And I think that the question here is simply whether the environmental assessment was adequate. If a full environmental impact statement had been done, the underlying data would be subject to scrutiny, I would think. Well, likely, likely it would. But the question is whether BLM made a reasonable determination that there was not a significant impact on the environment. And based on the evidence that it gathered of the condition of the range, I think it made a reasonable determination that the gathering and the excess horses would not cause a significant impact. Just so I understand your position, it's the BLM's position that the public is not entitled to see the underlying data for an environmental assessment absent a request under FOIA? Well, I think that FOIA is the correct way to look at it. Are you saying that if an interested member of the public wants to see the scientific data underlying the environmental assessment, the BLM's position is the public does not have a right to those documents? Is that the BLM's? I'm just asking you, is that the BLM's position? You know, this is not something I've had a chance to talk with the BLM about. I think that Plaintiffs did request it, and they got it later than they needed for the preliminary injunction, but they still got the information. But I think the EA was adequate, and that's the question that should be focused on. Thank you. Thank you. Thank you. Very briefly. I guess I just wanted to redirect the Court to the main premise behind this lawsuit in the first place, which is that the statute actually constrains what the BLM can and can't do, and it dictates which forces they can do it to. The Congressional Committee report said that caution must be exercised in determining what constitutes excess numbers. If we don't, if the Ninth Circuit doesn't tell the District Court that it abused its discretion by not having the BLM make a determination of driving natural ecological balance, then there is no constraint on what the BLM can do. What is your real concern here? Is your real concern that they're going to take more animals than they should? Yeah. Our real concern is that they're going to take more than they should, and they're going to take them when they don't need to. And as our other claims, namely the Principally claim, that they're going to manage these areas that are designated for the protection and preservation of wild horses and burros for some other use. Principally. And this gathering and removal is going to facilitate that.  It already has. Thank you, Your Honor. Thank you. Robert, may I correct you? Yes. It is not the BLM's position that plaintiffs must go through FOIA. In this case, they simply didn't request early enough to get it, and this apparently is covered in a declaration by Kenneth Hollom, which is in the record. We'll look at the record. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning. And the Court stands adjourned. And the Court appreciates the arguments of counsel in the last case. Thank you.
judges: Schroeder, Rawlinson, Bea